M.D. v. Unum Provident May I please record? My name is Tyreen Brett for Plaintiff Appellant Kevin McCann. I'd like to reserve three minutes for rebuttal. DONE. There are three issues which would require reversal, but I'd like to start with the first one and break it down because despite the volume of the appendix, it can be broken down in fairly simple multiples of three. There are three important cases on the question of whether or not Dr. McCann was totally disabled. This Court's opinion, Lassner, Miller, and Vieira. Let me stop you, Ms. Brett, because in the order of your briefing, it looks like the order in which you want to take the argument, I'm having a little trouble with the logic. If ERISA doesn't apply, we're in a whole different field, right? That's your last argument, so maybe you should tackle that first. You put it last in the brief, like I said, and apparently you're going to put it to the end here. Is that because you don't think you have much of an argument there? No, to the contrary. I think it's the easiest way to reverse this case. The whole proceeding below is on the assumption that ERISA applied, and even if that's true, Dr. McCann should have won his summary judgment. Can you explain why it matters? You know, standard of review not changing. What matters in terms of the remedies that the Court blows reasoning if, in fact, ERISA doesn't apply? Well, I'd like to answer Judge Jordan's question and then answer yours, both of which are good questions. The reason I think, actually, the safe harbor issue is so compelling is Judge Cooper below found that the policy issued to Dr. McCann doesn't reference the hospital, it doesn't reference the resident's supplemental disability program, it doesn't reference any of the discounts. It's not like the Menke's case, which is cited by Unum, because there was nothing to unbundle. Yes, the hospital had this program, but A, it's not even clear Dr. McCann was eligible to participate. He was a fellow, he wasn't a resident, and the fact of the matter is there's no evidence that he did participate. They sold him this policy through the hospital's broker. This is not a circumstance where there were a series of policies that were laid out there, right? Correct. I believe what happened is he did get a proposal for a hospital-affiliated policy. He didn't accept that proposal. The broker gave him another proposal that had nothing to do with the hospital, and that's the one he accepted. We're talking about the four elements you've got established for the safe harbor here. You focused in on the third one, the endorsement one, and you've rightly said, hey, this isn't like Menke in some ways, but isn't it like Menke, and isn't it importantly like Menke, in that the hospital picked the plan and said, if you want it, you can have it. Is that not an endorsement sufficient to say, that's what they presented to me? A reasonable employee would understand that as being presented to me by my employer. The problem with that is that there's no fact saying that the hospital chose this policy and told the broker to offer it. Isn't that kind of a racist? There's no evidence in the record that there was a panoply of things presented. The only indication is that this residence supplemental plan was the thing that Ford presented, so he took what he got. Well, that isn't what he got. There are two proposals in the record, one issued in February of 1991, which was associated with the residence hospital plan. A second proposal was offered to him in May. He didn't accept the proposal under the residence program, and in fact, the court found that the policy he purchased had no indicia of endorsement. It looked like the broker just simply made it a separate offering, and under the test of the other public courts, this is an issue that this court has never decided, but under the Johnson and Thompson case in the sixth and the first, is that it's clear that the policy is a third-party offering, and if you look at the proposal... You kind of put the rabbit in the hat there, Ms. Brett, when you said, well, it's clear it's a third-party offering. That's the very issue, right? That's the challenge here. You're asserting that it was clear, and I'm not seeing in the record where that is clear. On the contrary, the record seems to indicate that the residence supplemental plan was not part of a menu of options. You could get this plan from this person or this plan from this provider or this plan from this provider. Here's your supplemental plan. Am I wrong about the record? Because if I am, I'd be happy to be corrected. I'm going to, with all due respect, correct it. Okay, good. And I do want to get to Judge Bevis' question as well. Point me in the record to where there's an indication that there was something else going on other than Ford saying, if you want this residence supplement plan, here's the plan. If you look at the Rule 56 statement of defendants and Dr. McCann's response, there was a residence supplemental disability plan. Not sure whether Dr. McCann, who was a fellow, was eligible, but assuming he was, that's not the policy he purchased. There was a second offering that had nothing to do with the residence policy. There's no indicia. There's no further involvement of the hospital. They didn't collect premiums for him like they do in other cases. They didn't administer. They had nothing to do with the claim. He took care of it all on his own. But he bought it from Henry Ford Hospital, the residence supplemental disability insurance plan. That's the one we're talking about, no? No, he didn't buy that one. It's a separate policy. There's two proposals in the record, which we cited in the brief. One was in February of 1991. He didn't purchase that one. There was a second one in May. Which was called what? The policy. It was an individual policy. All through the record, you know, treats it like an individual policy. It says on the front, individual policy. There's no reference to a group number. There is some testimony, but it's sort of hazy as to whether this, there's actually no fact. It was a supposition because they had this residence program and therefore he must have purchased this through the program. But there is no fact. You have to look closely. She just accepted Unum's statements that they were connected and there's no fact. And in fact, her findings are to the contrary. She found, in her opinion, that the policy... We're familiar with what's in there. Okay. There was no discounted premium? There was a discount, but again, it's unclear why because all it appears from the face of the record and the policy is that if you pay your premiums annually as opposed to quarterly or monthly, you'll get a discount of a certain amount. That's the only discount that is clearly established in the record. Who does it fall on if the record's unclear? If the record isn't clear about why there was a discount or the record isn't clear about how the plan was offered, does that failure fall on the plaintiff for not establishing the eligibility for the safe harbor or does that somehow mean you're entitled to the safe harbor? I believe if it hasn't been established. There's law which we cited in our reply brief that says the burden is on the party seeking to establish the safe harbor. That would be you, right? Yeah. Isn't the plaintiff here the one saying, hey, I'm in the safe harbor? Yes, yes. Well, the two cases we cited put it on... Since they're trying to establish that this applies, that they have to establish that... That the safe harbor doesn't apply? That the safe harbor doesn't apply. That seems upside down, Ms. Brett. Even if it's our burden, the fact of the matter is there is no court in this country that says that the mere offering of a discount by an employer, and again, it's not even clear to me there is a discount here offered by an employer, but the mere offering of a discount is a contribution and that the mere offering of a discount is an endorsement. Okay. Well, those are two separate things, right? The attribution stands independent of the endorsement. Correct. And that's the only plausible connection. Again, I'm skeptical that there is even a discount offered by the hospital, arranged by the hospital, but even if that's true, this would be the only court in the United States, appellate or district, that holds that that's sufficient to trigger ERISA's involvement. Could I take it back? What practical effect does it have if this plaintiff falls within without ERISA, given that we're in de novo review land, we have the contract language in front of us? Why do you care? Well, it appears to me that ERISA would be a little bit easier, maybe that's because I do more ERISA cases than a contract in federal court, but it seems to me that the law is very clear under Lasser, Miller, and Vieira, Lasser and Miller being a deferential review, that he's entitled to be deemed totally disabled. Okay, let me take your... Sorry Lasser, let me finish the question. As a practical matter, going through her findings, the fact that she questions about credibility, et cetera, the proper thing under de novo review is to deny summary judgment and just do a trial on the application of the plan. In all likelihood, if you agree that she is wrong on summary judgment, that ERISA does not apply, again, it seems to me summary judgment could be granted on the breach of contract case. It's a breach of contract case below. The Kroner case in the Seventh Circuit said de novo review and breach of contract are treated the same way. As a practical matter, it would be practically the same trial. Contract law and ERISA under de novo review is just about the same, except for one thing. One advantage of being under ERISA is if the bad faith law is a little bit unclear, then under ERISA they are required, and this is one of the most troubling aspects of this case, if ERISA applies, that means they're fiduciaries. They have to behave like fiduciaries. If there's something, for example, that Dr. McCann needed to do to further his residual disability claim, those fiduciaries had an obligation to do it. So you're saying that the ERISA point matters, if not immediately, and this downstream in the case, if you get it sent back, it's going to be important. We would put on evidence that they breached their fiduciary duties. Now, there may be some law in New Jersey, this would be New Jersey law, that characterizes insurers as fiduciaries, and we would certainly avail ourselves of that. But that's very clear. This is actually one of the first courts to recognize that insurers and ERISA plans are fiduciaries in a Heineman Hospital case. Did you have something else? I got a quick question. I didn't understand what you meant when you said we could deal with the contract issue ourselves, or maybe I misheard you. Well, I think what I said, and I apologize for being confusing. No, I may have misunderstood. I think that since the standard review is plenary on a motion for summary judgment, the court could do what it could do under ERISA, the same standard breach of contract, is to say that it's clear that he met all the conditions for coverage and should be covered in terms of the remedy. Borrowing from Miller, we could go back and say that he should be given the benefits reinstated because it's they who screwed up. It's Newtom that didn't perform their fiduciary duty, and he shouldn't be punished for that and should reinstate him up to the present time. So in that sense, I think the relief could be the same regardless of whether we win. If we win on either the total disability issue under ERISA or the safe harbor issue. Why wouldn't we send it back to the district court? Well, I have some concerns about sending it back to this district court. As I work through this appeal, with all due respect to Judge Cooper, she got it so wrong in so many ways. Well, yeah, all due respect, that's a famous introductory phrase, isn't it? She gave you 66 pages of careful review of the facts, and you don't like how she came out on the law, but why would we not send it back to a district court judge who clearly gave careful thought and excruciatingly fine review of your factual assertions if we thought she had it wrong? I mean, that seems like a non-starter. In fact, that seems like a complete non-starter. But your opponents rely very heavily on DUDA. DUDA is a different case. Yeah, well, we're not bound by it, right? It's an NPL. It is indeed a different case, but why don't you distinguish it for us? What was it in DUDA that was so different that the reasoning there wouldn't apply here? Everything was different. And I'm not even saying that DUDA was wrongly decided because, I mean, you authored it. But first of all, it was a differential standard of review, which we don't have here. We had a doctor who claimed he could do certain things, but the medical evidence, there was no ever determination that he couldn't do any part of his job. It appears that his income wasn't so much by performing open surgeries, but he was doing these medical reports on the side, and that's where the sources of his income was, and that was his material job duties. And I can't remember what his condition is, but it didn't interfere with his ability to do so-called independent medical evaluations. So you're making a distinction based on main duty. That was the pertinent policy? Among other things. All right. But that was certainly a significant piece of it, whereas in Dr. McCann's case, there were three main duties of occupation, interventional radiology, diagnostic, and doing night call. The record's undisputed that if he couldn't do any of those things, he couldn't be an interventional radiologist, particularly at Holzer, and that's the only evidence that there was on the record. And he couldn't do any of them. He could do the diagnostic. He could do diagnostic, right? Well, they said that, but then that had to, it would have had to be considered if I could have instructed him that way. Everybody said that. You've got to stop. You've got to stop. When he starts or I start, it doesn't work if you keep talking. So go ahead. Maybe I misread all the documents, but everybody said that he could do the diagnostic part. Now, I understand that the diagnosis is part of the interventional radiology job as well, but he could do the diagnostic part alone. Well, assuming that's true, and it's not, because they didn't ask the other question for over a year. Am I wrong that the doctors said that? For over a year, they paid a residual disability benefit. You're not answering the question, and this will work much better if you listen to the question and try to answer it. The question is about the record. The question being put to you is about the record. Does the record not reflect that Dr. Caselli and the other physicians, including his treating physicians, said he was capable of doing the diagnostic work? No, I don't believe so. Dr. Caselli, and actually the letter that he wrote wasn't in front of the plan administrator when we terminated benefits. He said maybe you could try diagnostic as less stress, but it didn't consider. Maybe this will be easier. Can you point us in the record to anybody who said he cannot do diagnostic work? Anybody. There would be two places. One, the fact that they paid residual disability. You're missing my question. I'm not asking you about how you interpret the facts. I'm asking you, can you point us to someplace in the record where a physician or anybody else said he cannot do diagnostic work? It's a question about the record. Okay. Dr. Davis, who is their reviewer, said that, supported by Nurse LePray, they reviewed the records in terms of the initial payment of benefits. Said he could not do diagnostic work. That he could not work, yes. No, that he could not do diagnostic work. Did it say it in so many words? Yeah, that's the question that's being put to you. And I believe it's in Dr. Linder's 2010 report. All right. Okay, was there anything else that you wanted to add? Okay, we'll have you back on rebuttal. Thank you. Mr. Del Moro. Yes, good morning, Your Honors. It's my privilege to be before you. If I can, hearing the argument, I'm a little bit scratching my head, as if this policy that Dr. McGann purchased came out of thin air. Well, are they correct that it was not the resident supplemental policy? It was an independent policy that he bought later? Absolutely not. So you're saying that they're wrong about the record and that what he bought was the resident supplemental policy? That is correct. And what we rely upon is the whole record. That would include the following. Number one, we submitted two affidavits of our underwriter. That was part of the record and submitted before Judge Cooper that identified specifically where the policy came from, how it was assigned to this risk group, et cetera, et cetera. Number two, I direct you to Dr. McGann's admissions in this case. Appendix 3839, Dr. McGann admits that the disability income policy was issued by Provident Life to him as an eligible participant in the RSDP. And RSD being the resident supplemental disability plan? Correct. If you'll honor, take a look at Appendix 3839. Dr. McGann admits that the RSDP is an employee welfare benefit plan established and maintained by Henry Ford Hospitals, former employer for the purpose of providing supplemental disability income benefits to certain employees at the hospital, including McGann. Okay. Well, it would be good to know what the plan was. So let's say your position is this is the RSDP. Sure. So then David Maness of McCann is the broker who sells this. So his letters to McGann are then relevant in terms of how you're marketing this plan. He drops his Northwestern plan. He adopts RSDP. So we then can look at what the letters say in terms of what the parties are contracting for. That would be correct, Your Honor. And in terms of the endorsement, and I happen to have on the record, and it's in the Appendix 166, which is the hospital's broker's letter to Dr. McGann that Dr. McGann produced because below we had limited discovery, limited to the issue as to the applicability of ERISA before we filed our motions. But it starts by saying, quote, resident supplemental disability income insurance plan. It then goes on to describe the plan. It then goes on to say Provident Life is the leader in the industry for coverage for physicians. They were chosen by Henry Ford Medical Group to provide supplemental disability insurance to Ford physicians and will underwrite the plan. But what I find strange is Manis' letters cut against your position in favor of their position. Manis sends material saying the concern is your occupation is a recognized medical specialty with its own specific duties. It is possible for you to be disabled within your specialty while you can still be a physician. That's true. You are trying to draw the line here at being a radiologist. But if we draw the line at being an interventional radiologist, which Manis' letters support, it becomes much harder for you to prevail. That's not the case. I'm sorry. No, no. Go ahead. No, Your Honor. That's not the case at all, and that's not the position of Provident Life. The position of Provident Life, and exactly as Judge Cooper found, was that Dr. McGann was a board-certified radiologist with a sub-specialty in interventional radiology. Okay. So that's our starting point. That's the starting point. We agree on that. So turn to A459. Okay? This is the definitions in the contract. Your brief spent a lot of time talking about a lot of different physicians, but I'd like you to parse the contract. I'd like you and your adversary to parse this contract, too. It seems like this case comes down to how we parse the numbered paragraph one. You're not disputing that he was receiving care by a physician. Your brief hasn't said he didn't receive enough care. The whole case turns on whether he was not able to perform the substantial and material duties of your occupation, and the paragraph under that says if you have a recognized specialty within the scope of your degree or license, we will leave your specialty of your occupation, and you can have more than one occupation. If he has two specialties, he's got two occupations, right? So if that's right, and he is all the doctors with respect to your adversary, all the doctors seem to say he can do the interventional, that he can do the diagnostic work. All the doctors except Sweeney say he can't do night and weekend, and all the doctors except Sweeney say he's got a problem with interventional. There's a little dispute about the valsalva maneuver, but basically if that's right, that he can do diagnostic, but he can't do nights and weekends, and he can't do interventional, then he can't do collectively the substantial and material duties of an interventional radiologist, and we have his boss saying, at Holzer, saying he would not have been hired if he couldn't do night and weekend. So what's your response? That's a pretty powerful argument. If I may, I have lots of responses, Your Honor. But two, also Dr. Coselli completely released him to go back to work. He no longer supported disability. After this record closes? Well, I don't believe that's true. I think if you look at Dr. Coselli's office... Even if that were true, at the most you would have a material dispute of fact at that point, right, Mr. Delmaro? You'd have a dispute of fact about whether he was or was not disabled, not a circumstance where it could be ruled on summary judgment that no rational juror could look at this and say he was disabled. Well, Your Honor, I guess that takes us to adjudicating risk of claims, and I do want to... Go ahead. Finish that. ...and get to the disputed issues. Dr. McCann's case is premised upon his theory, and it goes to your question, that his occupation was limited to a recognized specialty here, interventional radiology. The problem with his argument is that his occupation wasn't limited to interventional radiology. In fact, that was very little as to what he actually did. Well, when you say that was very little as to what he did, now we're playing a definitional game, right? Because the case law, Lasser says, we look at what the job is that you're doing, right? And the only evidence we've got about that comes from two sources, the CMT analysis that you folks did and Dr. Long's testimony about how things ran at the hospital. Dr. Long said, as Judge Bibas just pointed out, that everybody does windows here. Nobody's just doing interventional stuff. We've got three people on staff who do interventional work. It takes a lot of time to do the interventional work, but everybody's got to work weekends, and everybody's got to do the diagnostic work. So if that's the way the job actually works in the real world, and that's the only evidence we have about how it works in the real world, how can we... This is, I think, the question that was being put to you. How do we look at that record and say, oh, that's not an interventional radiologist. That's just a radiologist. A hospital says you're an interventional radiologist, and these are the duties you have. What Dr. Long said was that he was hired as both an interventional and a diagnostic radiologist. I thought he said that we have three interventional radiologists on staff, and he's one of them. That's what I thought he said. Yes, and he did say that, that we do have three interventional radiologists on staff. He also said he was hired as both an interventional and a diagnostic radiologist. He also said that the way it worked was Dr. McGann would perform diagnostic radiology two weeks and would rotate every third week to do interventional, and even during that third week would do diagnostic radiology. So this comes down to a definitional point about what is, whether somebody is an interventional radiologist or not. Is that it? No, I believe what it comes down to and... How can that not be it? It's the language of the contract because the contract has a total disability provision and a residual disability provision. Well, stick with me. If he's an interventional radiologist and every doctor except for Sweeney says he can't do that, he can't do the interventional work, if he's an interventional radiologist and the vast weight of evidence is that he can't do that work, would that not end the case in his favor? It would absolutely not. In fact, it would not, and the reason why is because he, under your scenario, he is still able to perform 90%. You just have thought the hypothetical, right? Because you're trying to say he's not an interventional radiologist. I'm asking you to assume, if we decide he's an interventional radiologist, not he's an interventional radiologist some of the time, and most of the time he's not an interventional radiologist. If he's an interventional radiologist, Provident loses, right? No, Judge, because we believe that Dr. McGann can perform the duties of an interventional radiologist. Based on Dr. Sweeney? Based upon Dr. Sweeney and based upon Dr. Coselli's... Does he summarize judgment in the face of all the other evidence that he can't? I don't believe, I'm not sure what other evidence is there. Let's step back. I think there's a disagreement about what the contract means here that's being buried, right? Your brief is all about the percentage of billing codes, and the district judge cared a lot about that. I'm not sure why billing codes is the right measure. You also talk about the dollar value, okay? I'm not sure why dollar value of billings is the right measure. There are two other measures that help Mr. McGann here. One of them is the would you have been hired or not. I'm looking at appendix 3148 at the bottom, quoting Dr. Long. He stated the insurer would not have been hired by Holzer Clinic if he did not perform some interventional radiology. So the but-for is if he's not able to do this now because he's too sleepy during the day, or he can't do the valsalva maneuver, whatever, then they win on that measure. The other way that they win is if we focus on the number of hours spent. And that seems like a much more intuitive way to measure substantial material duties than billing codes, okay? So he's hired with a notice that his position is going to be, what, 28 hours of interventional plus 10. Some other documents say it's 20 plus 10. So it's 30 to 38 hours out of a 60-hour week. I don't see how, if we look at hours, that you don't lose on substantial material duties. If I can, Judge, what you're referring to was the employer statement that was completed by Dr. Long. When we interviewed Dr. Long with the attorney present, Dr. Long indicated that those were estimates based upon what he was doing. Right, but he never said anything implying that it was something somehow different than what Judge Bibas just pointed out. On the contrary, he said, and this is not very legible in the way the appendix comes out, but the answer that you've produced for us on page A3150 of the appendix is, interventional procedures take more time to perform. That's a quote. He stated, for example, that if he performs an angioplasty on a patient, the charge may be 10 times more than it would be if he read an MRI. However, he pointed out that in the same amount of time it takes him to perform an angioplasty, he can probably read more than 10 MRIs. In other words, you know, it's hard to say maybe which one's more lucrative, but it's clear that interventional work takes vastly more time. So the question put to you is a very sound one. Why would we do what the district court did? Because the district court judge said, McCann failed to explain how length of interventional diagnostic procedures impacts the data. How could it not impact our decision? If what you're doing with most of your time or a substantial part of your time is interventional work, who cares what the C codes, CMT codes, how do you say those? CPT. CPT, thank you. Who cares what the CPT units are? Well, but that's not the record in this case. The record in this case is that every two weeks. I thought I just created the record. Dr. Wong stated that he only did interventional radiology one of every three weeks, that there was a rotation. And so this isn't a case where the majority of his time he was doing interventional work, where you could say, oh, forget about, you know... Where do you get majority of the time? Substantial material is a contract language. If he's spending one third of his weeks doing this, sounds substantial material to me. And it is. And we acknowledge that interventional radiology is a substantial and material duty of his occupation. We acknowledge that. And night and weekends is substantial material, too. It most certainly is. So your whole case depends on our disbelieving everybody else at summary judgment and believing Sweeney and in your interpretation, Caselli, if we bring in this later disavowal. And I don't see how we can do that on summary judgment. That's not my case at all. My case is that, number one, of course, he can perform all those duties, but assuming that he cannot perform interventional radiology, he can perform diagnostic radiology. It was a material and substantial duty of his occupation. And that, therefore, under this court's opinion, for example, in Duda, that he is not totally disabled. Duda? Yes. I'm correctly reasoned, with deference to my colleague, but it was not only deferential, but the plan language there was about total disability. And Duda was reading the total disability provision in par materia with a residual disability provision that suggested that you had to be unable to do all of your duties for the total. This language doesn't say that. Different plan, different language. I mean, it's a contract dispute at bottom, right? So it doesn't really help to point to Duda and say, hey, they won in Duda. It was a different plan with different plan language. Well, Duda involved both an ERISA plan and an individual disability plan governed by Pennsylvania law. The individual plan had both a total disability provision that mindful said main duties of the occupation, where this says material and substantial duties. But the residual disability provision is the same. And if you notice, well familiar with Duda, but we're trying to get you to focus on this plan, this contract language. And I think Judge Schrick had a question. Well, Dr. Long even said that, at least with respect to the interventional part of the radiologist's job, that the diagnostic part was an integral part of this. And why would not the essential role of being an interventional radiologist be severely impacted here? Because he cannot perform that, even though he can perform the diagnostic part. That is, as you've heard, he was hired on the basis of being an interventional radiologist as well as a diagnostician. And he can't do that any longer. He can't perform the interventional part. So why isn't that either a central or a substantial material part of the job for which he was hired and performed? Well, I would, in terms of his hiring, I think the analysis under the contract should begin with what are the material and substantial duties of the occupation? Can you perform all or some? The occupation. That's where the rabbit goes in the hat, right, Mr. Del Mar? What is, quote, the occupation? And that's what we've got to figure out. This is a definition in the policy. Now, we've got a fundamental problem, and I'm going to be asking Ms. Brett and you to help us with this, because I don't recall a case where somebody has come up and said, hey, you guys are looking at the wrong policy at the appellate stage. We've got to figure that piece out. But assuming we're looking at the RSDP as the policy, you know, your entire case comes down to an assertion that being an interventional radiologist means you only do that and nothing else, because otherwise you're not, quote, limited to that. That's how I understand your brief, and that's how I understand your argument today. That is correct. That would require you to ignore the diagnostic duties that he was performing. And limited by its plain meaning, I think, means restricted, circumscribed.  And that is correct, Your Honor. All right. I think we've got your argument.  Ms. Brett, your rebuttal, please. Ms. Brett, could I ask you to pick up where your adversary left off? So I agree this is a contract case. I agree this is about how we parse A459. I think the best read of your adversary's argument is that when it says, you are not able to perform the substantial material duties, he reads it to mean you can't do any of the substantial material duties. And here you have three substantial material duties, and one of those is reading films, and he can do that. What's your response? Why should we read this to mean you can't perform all, collectively, of the substantial material duties? Because there's really two parts of the policy. There's total disability and residual disability. And if it were true that he could still do the diagnostic, there's plenty of suggestion. I couldn't find a direct quote saying the OSA disables you from reading films. But then they were obligated as fiduciaries, if this is an ERISA case, or as the contracting party, if this is a breach of contract, to examine residual disability. And they just blew it off and made up something. But if it is true that he can't do interventional but he can do diagnostic, that's what the residual disability provision is there for, when you can do some of the duties and you can make some money. Is that still in play? Yes. It's always in play. I mean, the contract is still being maintained. Dr. McCann is paying the premiums. But, again, if this is an ERISA plan, they are fiduciaries, and they paid him residual disability for a period of 12 or 14 months, and his only diagnosis was obstructive sleep apnea. And so they recognized, and so he thought that's what you do. When you present your evidence, they ask for what they wanted. They paid him for that period of time after a year-long investigation. And if it were true that he could do some of the duties but not all of them, that's a residual disability claim. He didn't submit the required monthly statements from this doctor for the sleep apnea, though, did he? He did. There were two. There was an attending physician statement from Dr. Linder, and then there was a report. I thought, maybe I'm confused about this. There was one from Dr. Linder. Sorry. It's only going to work if one. I know it's an artificial thing, right? In ordinary conversation, we speak over each other all the time. It doesn't hurt. It's not considered rude or anything. But in this context, we're making a recording of all this. I'm probably going to go back and listen to it. I'm not going to be able to hear us if we're talking over each other. So you've got to let us interrupt. Let me tell you what my understanding is. I understand that there were two APSs that went from Dr. Linder, I think. And then he did not submit those after that. There was one dated July 15th and one letter on an administrative appeal dated June 14th. And otherwise, no PSs from Dr. Linder. Now, if that's correct, isn't that a failure under the policy to establish residual disability benefit eligibility? No. Every form they asked him to provide, when they asked him to provide it, Dr. McCann provided. There's also an attendant physician statement. How can you say that? Sorry. I'm losing you. Because they said to him, this is contingent on your giving us the monthly stuff. And even with Dr. Caselli, he went back and said, Dr. Caselli doesn't want to keep doing this. There was some back and forth. So he understood there had to be a monthly report to keep the payments going. But with Dr. Linder, the APSs stopped coming. How is that not dispositive on the residual benefits? If there was something else that he was required, he provided everything he was told to provide. And as fiduciaries, if there was something else, there's a whole line of cases also from this court, Bixler and Ulysses, that if a participant needs something in order to maintain benefits, the fiduciary is obligated to tell them what it is. Well, is it better for you then to be under the ERISA umbrella? Would you rather abandon the Safe Harbor thing and say, go ahead, it's an ERISA plan? Because several of your arguments have now been going to the assertion that they're a fiduciary if it's an ERISA plan. So, you know, I'm happy to – if you're walking away from it, that's okay. Would you rather have it be an ERISA plan? No, in my heart I believe that this is not an ERISA plan. But if they want to call it an ERISA plan, then they have to behave like fiduciaries. And that's really the point. And the law is fairly well established under ERISA as to how this case, under Lasser, Miller, and Vieira, how this case should be handled. And it wasn't handled that way below. Okay. Thank you, Ms. Brett. And thank you, Mr. Gilmour. We've got the case under advisement.